**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SCOTT HANNA,           ) | |
|                         ) | CASE NO. 5:13CV1360 |
|         Plaintiff,     ) | |
|                         ) | |
|         v.               ) | JUDGE BENITA Y. PEARSON |
|                         ) | MAGISTRATE JUDGE GREG WHITE |
|                         ) | |
| CAROLYN W. COLVIN,     ) | |
|    Acting Commissioner of Social  ) | |
|    Security             ) | **REPORT & RECOMMENDATION** |
|                         ) | |
|         Defendant.   ) | |

Plaintiff Scott Hanna ("Hanna") challenges the final decision of the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a period of disability ("POD"), disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## I.  Procedural History

In March 2010, Hanna filed applications for POD, DIB, and SSI alleging a disability onset date of March 17, 2005[1] and claiming he was disabled due to back injury/surgery, arthritis,

---

[1] In her brief, the Commissioner states that Hanna's alleged onset date is January 23, 2009. (Doc. No. 14 at 1.)  She provides no citation to the record for this date, however, and both the ALJ decision and Hanna state that his onset date is March 17, 2005. (Tr. 12; Doc. No. 13 at 1.)  Upon its own review, the Court notes that Hanna identified March 17, 2005 as his onset date in his disability applications.  (Tr. 124, 131.)  Neither party directs this Court's attention to any evidence in the record indicating Hanna subsequently amended his onset date.  Thus, the Court assumes Hanna's alleged onset date is March 17, 2005.

depression, attention deficit disorder, and high blood pressure.  (Tr. 124- 125, 131-134, 151.)

His application was denied both initially and upon reconsideration.  (Tr. 84-90, 94-99.)

On January 11, 2012, an Administrative Law Judge ("ALJ") held a hearing during which

Hanna, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 29-69.)

On January 20, 2012, the ALJ found Hanna was able to perform a significant number of jobs in

the national economy and, therefore, was not disabled.  (Tr. 12-23.)  The ALJ's decision became

final when the Appeals Council denied further review.  (Tr. 1-5.)

## II.  Evidence

### *Personal and Vocational Evidence*

Age forty-nine (49) at the time of his administrative hearing, Hanna is a "younger"

person under social security regulations.  *See* 20 C.F.R. § 404.1563 (c) & 416.963 (c); (Tr. 35.)

He has a high school education and past relevant work as an industrial truck operator.  (Tr. 21-

22, 36, 57.)

### *Hearing Testimony*

During the January 11, 2012 hearing, Hanna testified as follows:

- He is not married, and lives alone in an apartment.  (Tr. 36, 49-50.)

- He obtained a GED.  He has not worked since March 17, 2005.  Prior to that, he loaded and unloaded trucks with a tow motor.  (Tr. 36-37.)

- He had back surgery several years ago.  Since then, the pain has become "worse, worse, worse."  (Tr. 40-41.)

- He currently experiences daily back pain that radiates down both legs.  His pain is worsened by activity, such as taking his clothes to the laundromat.  (Tr. 41-43.)

- He also suffers from arthritis in both knees.  He experiences pain every day, but some days "are a lot worse than others."  (Tr. 43-44.)

- He sustained a chronic rotator cuff tear in his left shoulder when he was "trying to lift something."  (Tr. 44.)  He continues to experience aching in his left shoulder and feels his left shoulder is weaker than the right.  (Tr. 44-45.)

- He can lift his left arm over his head, but it is painful.  He cannot reach straight out to the side with his left arm.  He cannot lift objects weighing over 20 pounds with his left arm.  (Tr. 45.)

- He also has trouble with swelling and numbness in his feet.  He fears he may be getting a bunion.  (Tr. 46, 53.)

2

- He was diagnosed with ADHD as a child and prescribed Ritalin. (Tr. 48.)  He has been diagnosed with depression.  He does not currently take anti-depressant medication.  He has had one panic attack in the last year.  Sometimes he has difficulty getting along with coworkers and supervisors.  (Tr. 46-48.)

- He cannot stand in one spot for a long period of time.  He can walk for approximately 15 minutes before having to rest.  He has difficulty bending, stooping, and squatting.  He is not sure how much he can lift.  He has problems with fine manipulation "at times" because his hands cramp "pretty easily."  (Tr. 48-49.)

- He does not sleep well at night.  He could not remember the last time he slept more than two hours without waking up.  (Tr. 50.)  He sometimes sleeps during the day.  (Tr. 55.)

- He does most of his own cooking and grocery shopping.  He does some cleaning around the house, but his sister often helps.  He does his laundry, but "then [has] trouble the next day" with soreness.  (Tr. 50, 52.)

- He reads a lot and goes to the library almost every day.  He also watches TV.  He gets out of the house five days out of each week.  (Tr. 50-51.)

- He has good days and bad days.  In an average month, he has approximately 18 bad days.  On a bad day, he does not normally make it out of his house and has a "tendency to not do much."  He is normally not able to walk two blocks on a bad day.  (Tr. 52.)

- He has difficulty concentrating because of his ADHD.  He has a hard time focusing and "wander[s] off."  (Tr. 53.)  Sometimes it is difficult for him to read. (Tr. 54.)  He can sit still for approximately 15 minutes or so before he loses his attention or has to move.  (Tr. 54.)

- He takes methadone and uses lidocaine patches for pain.  He does not experience any side effects from these medications.  (Tr. 54-55.)

The VE testified Hanna had past relevant work as an industrial truck operator

(semiskilled, SVP 3, performed at the light level).  (Tr. 57.)  The ALJ then posed the following

hypothetical:

> I would like you to assume a younger person with a high school education and the claimant's work history.  Can perform light work but cannot climb ladders, ropes or scaffolds, and can only occasionally climb ramps and stairs. Assume this person can occasionally stoop, kneel, crouch, or crawl. * * * Assume this person cannot reach overhead with his left arm and can only occasionally reach in the other directions with that arm. Could this person perform any of the claimant's past work?

(Tr. 58-59.)  The VE testified that such a hypothetical individual would not be able to perform

Hanna's past relevant work but could perform other jobs such as (1) cashier II (light, unskilled,

SVP 2); (2) coffee shop counter attendant (light, unskilled, SVP 2); and, (3) sales attendant

3

(light, unskilled, SVP 2).[2]  (Tr. 59-60, 66-67.)

The ALJ then posed a second hypothetical that was the same as the first, but added the limitation that the individual "cannot sit for more than 15 to 30 minutes at a time and cannot stand/walk for more than one hour at a time."  (Tr. 60-61.)  The VE testified that such a hypothetical individual could perform the cashier II job, but the number of jobs would be "greatly reduced."  (Tr. 61.)  In addition, the VE stated the hypothetical individual could perform the job of small products assembler (light, unskilled).  (Tr. 61.)

The ALJ then posed a third hypothetical that was the same as the second, but added the limitation that, because of pain, the individual "has difficulty maintaining concentration and attention such that he will be off-task at least 20 percent of the time." (Tr. 62.)  The VE testified that such a hypothetical individual "would not be competitively employable." (Tr. 62.)

The ALJ then posed a fourth hypothetical as follows:

> I'd like you to assume a younger person with a high school education and the claimant's work history, can perform light work but cannot climb ladders, ropes, or scaffolds, and can only occasionally climb stairs– actually, what I'm asking for is the first hypothetical with sedentary work and that– the– remember, that had he cannot reach overhead with his left arm and can only occasionally reach in other directions with that arm.

(Tr. 62-63.)  The VE testified there would be no jobs for such a hypothetical individual.  (Tr. 63.)

Hanna's attorney then asked the VE to assume the first hypothetical question but added the limitation that the hypothetical individual would be limited to routine, low-stress work with only occasional contact with the public.  (Tr. 65.)  The VE testified there would be no jobs for

_____

[2]  The VE originally testified that, in addition to the cashier II and coffee shop counter attendant jobs, the hypothetical individual could perform the job of housekeeping cleaner (light, unskilled, SVP 2.)  (Tr. 59.)  However, upon questioning by Hanna's attorney, the VE testified that she misunderstood the first hypothetical as requiring no overhead reaching with the left arm and occasional overhead reaching with the right arm.  (Tr. 64.)  After the ALJ clarified that the first hypothetical specified no overhead reaching with the left arm and occasional reaching in all directions with that same arm, the VE testified that the hypothetical individual could not perform the housekeeping cleaner job but could perform the cashier II and coffee shop counter attendant jobs. (Tr. 64-65.)  The VE later identified sales attendant as another job that this hypothetical individual could perform.  (Tr. 66-67.)

such a hypothetical individual.  (Tr. 65.)

The ALJ then posed a fifth hypothetical that was the same as the first, but added the following limitations:

> [A]ssume this person can understand, remember, and carry out simple instructions and perform simple routine tasks.  Assume this person requires a low-stress workplace without strict quotas or fast-paced production demands, and assume this person can have occasional contact with the public and co-workers.  Make that frequent contact with the public and coworkers.  Are there jobs existing that that individual could do?

(Tr. 67.)  The VE testified such a hypothetical individual could perform the three previously identified jobs; i.e. cashier II, coffee shop counter attendant, and sales attendant.  (Tr. 67-68.)  In response to a question from Hanna's attorney, the VE also stated those jobs would be eliminated if the hypothetical above allowed only occasional contact with the general public. (Tr. 68.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[3]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Hanna was insured on his alleged disability onset date, March 17, 2005, and remained insured through December 31, 2010.  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Hanna must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Hanna established medically determinable, severe impairments, due to postlaminectomy syndrome, degenerative disc disease of the lumbar spine, degenerative arthritis in both knees, chronic rotator cuff tear in the left shoulder, and obesity; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 14-17.)  Hanna was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 17-21.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hanna was not disabled.  (Tr. 22-23.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Treating Physician Talampas*

Hanna argues the ALJ failed to articulate good reasons for rejecting the opinion of his treating physician, Liza D. Talampas, M.D.  He maintains Dr. Talampas' opinion is "consistent with nearly four years of consistent and repetitious treatment," and is supported by both diagnostic and physical examination findings.  (Doc. No. 13 at 16-17.)  Hanna asserts the reasons proffered by the ALJ for rejecting Dr. Talampas' opinion are both unsupported by the record and an inappropriate basis for finding Hanna capable of light work activity.

The Commissioner argues the ALJ properly discounted Dr. Talampas' opinion on the grounds it was inconsistent with the medical evidence, Dr. Talampas' own treatment notes, and, Hanna's reported daily activities.  (Doc. No. 14 at 8-9.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[4]

---

[4]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are

---

the source is familiar with other information in the case record relevant to the decision.

'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855;  *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the medical evidence indicates Hanna presented to Dr. Talampas on at least twenty-eight occasions between February 2007 and November 2011.  (Tr. 232-384; 542-573; 586-613.) During these visits, he complained variously of pain in his back, knees, shoulder, hands, feet, elbows, and thigh.  *Id*.  He also reported numbness and tingling in his fingers and legs; ankle swelling; and, stiffness in his joints and hands.  (Tr. 368, 358, 344, 299, 296, 547.) His weight fluctuated between 222 and 247 lbs.  (Tr. 338, 262.)

On several occasions, Hanna reported exacerbation of his back pain due to activity or falls/accidents.[5]  (Tr. 364, 348, 284, 244, 240.)  He also complained periodically of increased pain and/or swelling with walking, standing up, sitting, and lifting household objects.  (Tr. 355, 358, 368-369, 275-276, 256, 603, 557.)  Dr. Talampas' treatment notes indicate Hanna was treated primarily with pain medication (including Methadone, Vicodin, Percocet, and Tramadol); lidocaine patches; and, steroids or steroid injections.  *See e.g.* Tr. 233, 237, 241, 244-245, 252-254, 256-257, 267-268, 296, 334, 338, 355, 368, 361.  There is also reference to Hanna's use of a knee immobilizer; elbow brace; and, a "light weight wheelchair."[6]  (Tr. 355, 352, 284, 269, 273, 277, 286, 293, 298, 302, 329, 340, 346, 350.)  In addition, the record indicates Hanna attended eleven physical therapy sessions between September and November 2007 to address shoulder pain relating to his chronic rotator cuff tear.  (Tr. 303-337.)

---

[5]  Hanna directs the Court's attention to medical records indicating he visited the emergency room ("ER") on two occasions (in August 2010 and July 2011) due to increased back pain.  (Tr. 494-499, 583-584.)  One of these visits was due to an exacerbation of pain after Hanna "tried to open a window that was stuck and kind of felt a tweak in his back and ever since then it has gradually and progressively worsened."  (Tr. 494.)  On both occasions, Hanna was discharged in stable condition and prescribed pain medication.  (Tr. 494, 583.)

[6]  In his Brief, Hanna indicates he was first prescribed a "light weight wheelchair" in June 2007, and that this prescription was discontinued in March 2009. (Tr. 352, 266.)

10

Dr. Talampas' notes indicate Hanna's condition was often described as "stable" and his pain described as adequately or well controlled with pain medication.  (Tr. 364-365, 255-257, 547-549, 542-544, 588-591.)  On several occasions, Hanna reported improvement related to his pain or otherwise indicated he was doing "better" or "okay."  (Tr. 338, 296, 542, 303, 270-271.)  Moreover, while Hanna sometimes complained of difficulty walking and standing, he also occasionally reported increasing his physical activity level in order to lose weight.  (Tr. 252, 256, 279, 564.)

Hanna underwent an MRI of his left shoulder in August 2007, which showed a full-thickness tear of the supraspinatus tendon at the anterior insertion along with degenerative changes involving the glencid.  (Tr. 347.)  The following year, in June 2008, Hanna underwent an MRI of his left knee.  (Tr. 375.)  This MRI revealed signal changes in the medial tibial plateau and the adjacent segment of the MCL suggestive of mild bone bruising and a low-grade MCL sprain.  *Id.*  It also showed mild degenerative signal changes in the posterior horn of the medial meniscus with possible mild fraying, but no discrete tear.  *Id.*  Finally, in June 2010, Hanna underwent X-rays of his lumbar spine that showed "midline laminectomy defects at L2 and L3 and possibly, in part, L4," as well as "generalized degenerative disc space narrowing of the lower four lumbar disc spaces with osteophyte formation" and mild scoliosis.  (Tr. 456.)

In July 2009, Dr. Talampas completed a basic medical form for the Wayne County Department of Job and Family Services.  (Tr. 614-615.)  This form does not contain any meaningful discussion of Hanna's impairments or medical history, other than identifying several of his medications; listing a series of code numbers that apparently relate to various diagnoses; and, stating without explanation that Hanna is "in wheelchair."  *Id.*  Moreover, Dr. Talampas indicates in the form that no physical functional capacity testing had been performed.  (Tr. 615.)

On January 10, 2012, Dr. Talampas completed a more comprehensive physical RFC questionnaire.  (Tr. 616-618.)  Therein, she offered that Hanna could (1) lift and carry 10 pounds on an occasional and frequent basis; and, (2) stand, walk, and sit (with normal breaks) for about 2 hours each in an eight hour work day.  (Tr. 616. )  Dr. Talampas concluded Hanna would need the opportunity to shift at will from sitting and standing/walking, indicating specifically that he

11

would need to alternate sitting, standing, and walking every 30 to 45 minutes.  (Tr. 616-617.)
She also found Hanna could never twist, stoop, bend, crouch or climb ladders, and that he could
only occasionally climb stairs.  (Tr. 617.)  She indicated Hanna's abilities to reach (including
overhead) and push/pull were affected by his impairments, and that he should avoid concentrated
exposure to extreme cold and heat.  (Tr. 617-618.)  Finally, she anticipated Hanna's impairments
or treatment would cause him to be absent from work "more than four days per month."  (Tr.
618.)  Dr. Talampas based her findings on MRIs of Hanna's lumbar spine,[7] left knee, and left
shoulder, along with a diagnosis of degenerative joint disease of the acromioclavicular joint, a
history of recurrent back strains, and "problems with knee and shoulder."  (Tr. 617-618.)

          In the decision, the ALJ discussed at length the medical evidence regarding Hanna's
postlaminectomy syndrome, degenerative disc disease of the lumbar spine, degenerative arthritis
in both knees, obesity, and chronic rotator cuff tear.  (Tr. 17-19.)  The decision also discussed
Hanna's hearing testimony regarding his symptoms and their impact on his daily activities.  (Tr.
19.)  The decision then evaluated the opinion evidence, assigning "some weight" to the opinion
of state medical consultative examiner Lokendra Saghal, M.D. (Tr. 453-460) that Hanna was
"somewhat impaired" in his ability to lift and carry due to his chronic back and knee pain.  (Tr.
20.)  With regard to non-examining state agency physicians Maria Congbalay, M.D., and Leon
Hughes, M.D., the ALJ explained that these physicians found Hanna could perform work at the
light level but could never climb ladders, ropes, or scaffolds; only occasionally crouch, kneel,
and crawl; and, was limited to frequent reaching in all directions with his left shoulder.  (Tr. 461-
468, 520.)  The ALJ gave "the opinion of these experts in Social Security regulations great
weight with respect to the exertional limitations and some of the postural limitations."  (Tr. 20.)
However, the decision noted that "the evidence received at the hearing level suggests Mr. Hanna
is more limited in his ability to stoop, his ability to climb ramps and stairs, and in his reaching

---

          [7]  Dr. Talampas indicates in the January 2012 RFC Questionnaire that Hanna underwent
an MRI of his lumbar spine in March 2005, which showed "S/P laminectomy L2 & L3; mild disc
bulges."  (Tr. 617.)  Hanna does not direct this Court's attention to any documentation of this
MRI in the medical record, other than this brief reference in Dr. Talampas' opinion.

with his left arm" and, therefore, the ALJ assigned "little weight" to those portions of Dr.

Congbalay and Dr. Hughes' opinions.  (Tr. 20.)

> The ALJ then discussed Dr. Talampas' opinion as follows:

> On January 10, 2012, Dr. Liza Talamdas [sic] completed a Medical Opinion with respect to what she has determined to be Mr. Hanna's abilities and limitations. Interestingly, she also completed an Ohio Department of Jobs and Family Services form which shows there was no functional capacity testing performed (B19F).  Nonetheless, she now opines that Mr. Hanna can lift and carry only 10 pounds on an occasional and frequent basis.  She also opined that he could stand, walk and sit for only two hours in an eight-hour workday.  She further opined that he would need to sit 30-45 minutes and then stand 30-45 minutes alternatively. Likewise, she opined that he would have to walk every 30-45 minutes for at least five minutes at a time. Moreover, she opined that he could never twist, stoop, crouch or climb ladders.  Yet, she noted he could occasionally climb stairs. Further, reaching overhead and pushing/pulling are affected, but she did not note the frequency.  She also noted that he must avoid concentrated exposure to extreme cold and extreme heat, even though these are never alleged to exacerbate his condition (B20F).  I give the opinion of Dr. Talamdas [sic] little probative weight because it is not consistent with the medical evidence of record. Specifically, on May 23, 2011, Mr. Hanna reported he was doing "okay" (B15F/3).  Likewise, the record shows only routine and conservative treatment with the use of medications and at the same dosage over time.  Further, her treatment notes show he has been stable in pain management (B15F/10). Consequently, Dr. Talamdas' [sic] opinion is not supported by the record as a whole, including Mr. Hanna's reported daily activities.

(Tr. 21.)  He formulated the RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs.  In addition, the claimant can occasionally stoop, kneel, crouch, and crawl.  Lastly, the claimant cannot reach overhead with his left arm and can only occasionally reach in other directions with that arm.

(Tr. 17.)[8]

> The Court agrees that the fact Hanna reported "doing okay" during one visit in May 2011

is not, standing alone, a "good reason" for discounting Dr. Talampas' opinion.  While it is true

---

[8]  Pursuant to 20 C.F.R. 404.1567(b), "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

Hanna occasionally reported to Dr. Talampas that he was doing "okay," the record also contains instances where Hanna reported feeling worse or experiencing an exacerbation of his pain. (Tr. 364, 348, 284, 244, 240, 603, 589.)  Indeed, just three months after his May 2011 visit, Hanna reported to Dr. Talampas that he increased his use of lidoderm patches because of pain.  (Tr. 603.)  Moreover, in November 2011, Hanna reported his back had been "bothering him more lately," and stated the "pain comes and goes." (Tr. 589.)  Thus, the Court finds the ALJ's reliance on this single, isolated remark that Hanna was "doing okay," does not, in and of itself, constitute a "good reason" for according only "little weight" to Dr. Talampas' opinion.

The Court also questions the ALJ's reliance on references in some of Dr. Talampas' treatment notes that Hanna was "stable" in pain management.  As this Court has previously observed, the fact that a claimant has been described as "stable" is of "rather limited utility in the disability context."  *Kiefer v. Comm'r of Soc. Sec.*, 2014 WL 66717 at * 5 (N.D. Ohio Jan. 8, 2014).  *See also Hicks v. Comm'r of Social Sec.*, 2009 WL 3127183 at * 3 (S.D.Ohio Sept. 28, 2009) ("Stable" is a medical term that simply means a condition is neither better nor worse); *Lechner v. Barnhart*, 321 F.Supp.2d 1015, 1030 (E.D. Wisc.2004) ("One can be stable and yet disabled."); *Davisson v. Astrue*,  2011 WL 2461883 at * 10 (N.D. Ohio June 17, 2011) ("A person can have a condition that is both 'stable' and disabling at the same time.") (citations omitted).  This is because the use of the term "stable" in the disability context does not describe the severity of an impairment.  *See Lingenfelter v. Comm'r of Soc. Sec.*, 2013 WL 5428731 at * 10, fn 7 (N.D. Ohio Sept. 26, 2013).  Indeed, pursuant to *Dorland's Illustrated Medical Dictionary*, 30th ed., 2003, "stable" simply means "not moving, fixed, firm; resistance to change."  In other words, the fact that Hanna was "stable" meant only that his pain management had neither improved nor worsened.  As such, in this context, treatment notes indicating Hanna was "stable" do not constitute a "good reason" to reject Dr. Talampas' opinion.

However, these are not the only reasons provided by the ALJ for discounting Dr. Talampas' opinion.  The ALJ also explained that he accorded Dr. Talampas' opinion "little probative weight" because "the record shows only routine and conservative treatment with the use of medications and at the same dosage over time."  (Tr. 21.)  In this regard, the ALJ

14

emphasizes (in his discussion of the relevant medical evidence) that Hanna's chronic back, knee, and shoulder pain have been treated primarily with pain medication throughout the nearly seven year time period between his March 2005 onset date and January 2012 decision. (Tr. 18.) While the ALJ acknowledges Hanna's June 2008 knee MRI and June 2010 spinal X-rays, the decision underscores that these tests primarily showed mild or generalized degenerative changes. The decision also observes that Hanna continued to be treated principally for his chronic back and knee pain with pain medication, even after these tests were performed and evaluated. (Tr. 18-19.) The ALJ also notes that physical therapy and cortisone injections were helpful with regard to Hanna's chronic rotator cuff tear in his left sholder. (Tr. 19.)

In addition, the ALJ emphasizes that Hanna was maintained on the same medication dosage "over time." (Tr. 21.) Earlier in the decision, the ALJ explains as follows:

> The record also shows that Mr. Hanna has been prescribed Methadone for pain. The record shows that over the course of the applicable timeframe relative to his application, he has been prescribed 10 mg tablets three times daily without any increases in his medication dosage or frequency (B3F, B4F, B18F). Consequently, this implies that his pain level has been constant and his condition is stable. Moreover, this suggests the medication is helpful in alleviating his symptoms.

(Tr. 20.) Hanna does not challenge this statement[9] or otherwise specifically explain how it fails to support the ALJ's rejection of Dr. Talampas' opinion. Finally, the ALJ observes that, while Hanna was once prescribed a wheelchair in 2007, "he later reported that he uses only a cane on occasion for ambulation and only when the pain is severe." (Tr. 18.) Indeed, Hanna acknowledges that his prescription for a "light weight wheelchair" was discontinued in March 2009. (Doc. No. 13 at 8, fn. 1.)

As further grounds for according Dr. Talampas' opinion "little probative weight," the ALJ found that the functional limitations set forth therein were not supported by "Mr. Hanna's

---

[9] While Hanna does not raise this issue, the Court notes that Dr. Talampas' treatment notes indicate Hanna's methadone dose in March 2007 was 5 mg once/day and that it was gradually increased to 10 mg three times/day by November 2007. (Tr. 366, 302.) Since November 2007, however, the ALJ is correct that the dosage and frequency of Hanna's methadone prescription has remained constant at 10 mg three times/day.

reported daily activities." (Tr. 21.)  In this regard, the decision notes that Hanna reported being able to walk a few blocks to the library "almost every day." (Tr. 18, 19.)  He also occasionally reported riding his bike and being able to push a cart full of laundry to the laundromat.  (Tr. 18, 19.)  Further, the ALJ noted Hanna's hearing testimony that he is able cook, do some cleaning, and do some dishes. (Tr. 19.)  While Hanna cites hearing testimony that he has 18 "bad days" per month when he is unable to leave his apartment, the ALJ found "the number of his 'bad days' [was] not credible." (Tr. 18.)  Hanna does not challenge this credibility finding.

Finally, the decision suggests that, at least to a certain extent, the ALJ discounted Dr. Talampas' opinion on the grounds that it was incomplete and/or internally inconsistent.  For example, the ALJ notes that Dr. Talampas concluded Hanna's overhead reaching and push/pull capacities are affected "but she did not note the frequency." (Tr. 21.)  The decision also observes that Dr. Talampas opined Hanna could "never twist, stoop, crouch, or climb ladders. Yet, she noted he could occasionally climb stairs." *Id.*  Finally, the ALJ notes that Dr. Talampas found Hanna must avoid concentrated exposure to extreme cold and heat "even though these are never alleged to exacerbate his condition." *Id.*

Hanna does not object to these particular characterizations, or otherwise argue they would not be valid reasons for the ALJ to question the value of Dr. Talampas' overall opinion.  Indeed, courts have upheld an ALJ's rejection of a physician opinion on the grounds that it is inconsistent, unclear, or vague.  *See e.g. Coldiron v. Comm'r of Soc. Sec.*, 2010 WL 3199693 at * 4 (6th Cir. Aug. 12, 2010) (finding ALJ appropriately rejected treating physician opinion on the grounds that it was "too inconsistent and unclear to be helpful"); *Gaskin v. Comm'r of Soc. Sec.*, 2008 WL 2229848 at * 4 (6th Cir. May 30, 2008) (finding ALJ properly rejected portion of a non-treating physician opinion that he characterized as vague).

Based on the above, and reading the decision as a whole, the Court finds the ALJ sufficiently articulated "good reasons" for rejecting Dr. Talampas' opinion.  While some of the ALJ's stated reasons are not an appropriate basis for rejecting a treating physician's functional capacity assessment, the ALJ properly rejected Dr. Talampas' opinion on the grounds that (1) it was inconsistent with medical evidence indicating Hanna had been primarily treated with pain

16

medication throughout the nearly seven year time period since his alleged onset date; (2) this treatment appeared to be sufficient to alleviate Hanna's symptoms since he was maintained on the same medication dosage and frequency over time; (3) the opinion was inconsistent with Hanna's reported daily activities; and, (4) the opinion was, in certain respects, incomplete and/or internally inconsistent.  (Tr. 21.)

Although Hanna cites evidence from the record that he believes supports the limitations set forth in Dr. Talampas' opinion, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton,* 246 F.3d at 772-73.  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In the instant case, the ALJ articulated several "good reasons" for rejecting Dr. Talampas' opinion and these reasons are supported by substantial evidence.  Accordingly, Hanna's argument that the ALJ violated the treating physician rule in his consideration of Dr. Talampas' opinion is without merit.

### *Obesity*

In his second assignment of error, Hanna argues the ALJ failed to properly evaluate the impact of his obesity pursuant to Social Security Ruling ("SSR") 02-1p, 2002 WL 34686281 (Sept. 12, 2002).  He maintains the ALJ "only gave a cursory review of Plaintiff's obesity" and failed to specifically address the contributing impact of obesity on his "severe musculoskeletal problems." (Doc. No. 13 at 20-21.)  Hanna asserts the ALJ's failure to properly consider his obesity as required by SSR 02-1p constitutes legal error and necessitates a remand.

The Commissioner argues the ALJ specifically considered Hanna's obesity at Steps Two, Three, and Four of the sequential evaluation process.  Citing Sixth Circuit precedent, she notes that SSR 02-1p does not mandate a particular mode of analysis, "but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."  *Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at *3 (6th Cir. Dec. 22, 2009).  Because the ALJ expressly discussed Hanna's obesity throughout the decision, the

17

Commissioner maintains the ALJ conducted a proper evaluation. (Doc. No. 14 at 9-10.)

SSR 02-1p provides guidance on Social Security Administration ("SSA") policy concerning the evaluation of obesity in disability claims. Although the SSA no longer qualifies obesity as a "listed impairment," SSR 02-1p "remind[s] adjudicators to consider its effects when evaluating disability." SSR 02-1p, 2002 WL 34686281 at * 1. Specifically, the Ruling provides as follows:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

> * * *

> As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

SSR 02-1p, 2000 WL 628049 at * 6-7. In addition, the Ruling states that "[w]hen we identify obesity as a medically determinable impairment . . . , we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify." *Id*. at * 7.

Interpreting the above, the Sixth Circuit has found that "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 2006 WL 229795 at * 3 (6th Cir. Jan. 31, 2006). *See also Coldiron v. Comm'r of Soc. Sec.*, 2010 WL 3199693 at * 7 (6th Cir. Aug. 12, 2010); *Nejat*, 2009 WL 4981686 at * 3. Rather, SSR 02-1p provides only that "obesity, in combination with other impairments, 'may' increase the severity of other limitations." *Bledsoe*, 2006 WL 229795 at * 3. *See also Hall v. Comm'r of Soc. Sec*., 2013 WL 6175660 at * 8 (N.D. Ohio Nov.

18

22, 2013); *Lucas v. Astrue*, 2013 WL 1150026 at * 6 (N.D. Ohio Feb. 15, 2013).

In the instant case, the Court finds the ALJ properly considered Hanna's obesity and its effect on his ability to function.  The ALJ first found Hanna's obesity constituted a severe impairment at Step Two of the sequential evaluation process.  (Tr. 14.)  The decision thereafter discussed Hanna's obesity in the context of Step Three, finding that:

> In reaching the conclusion that the claimant's impairments do not rise to listing level, I also considered the effect [his] obesity has on [his] other impairments and on [his] ability to perform routine movement and necessary physical activity within the work environment.  I also considered how [his] obesity may cause fatigue that would affect [his] ability to function physically pursuant to Social Security Ruling 02-1p.  Because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's obesity either singularly or in combination with [his] other medically determinable severe impairments results in limitations greater than those assessed in this opinion.

(Tr. 17.)  At Step Four, the ALJ evaluated the medical evidence regarding Hanna's obesity in the context of his RFC assessment as follows:

> With respect to his weight, Mr. Hanna's weight has ranged from 225 (May 25, 2010) to 248 pounds (B4F/44.)  At the hearing, he reported that he stands 5'10" and weighed 230 pounds. This amounts to a body mass index of 33 and is classified as obese.  However, at the consultative examination of June 14, 2010, Mr. Hanna was able to maneuver the examination room, although he had a hard time getting on and off the examination table.  Yet, he had no swelling in his joints and he had good strength.  Moreover, he had good range of motion of his knees.  Based upon this examination and the record as a whole, I have taken into consideration the combination of his other impairments with his obesity.  As the physical examinations were mostly unremarkable, I find that he is able to perform work at the light exertional level with the other restrictions stated herein.

(Tr. 18-19.)

Hanna contends the Court's reasoning in *Norman v. Astrue*, 694 F.Supp.2d 738 (N.D. Ohio 2010) applies herein and necessitates a remand.  In *Norman*, this Court reversed the ALJ decision and remanded for a proper evaluation of the claimant's obesity under SSR 02-1p.  In that case, the ALJ did not include obesity among Norman's severe impairments and failed to "discuss the effect of obesity as to Norman meeting the listings or in his RFC assessment." *Norman*, 694 F.Supp.2d at 748 n. 4, 749.  Moreover, the Court found that "the ALJ appears to have either discounted or discredited Norman's back pain allegations because he is obese, rather than evaluate whether his obesity exacerbates his back problems." *Id*. at 749.  "In other words, the ALJ appears to have analyzed Norman's limitations not as they actually existed, but rather from the

hypothetical standpoint of what Norman's limitations would be if he lost weight as recommended by his physicians." *Id.* Because the Court could not "discern how the ALJ evaluated Norman's obesity," it concluded the decision failed to follow SSR 02-1p and remanded for further consideration of this issue. *Id.* at 750.

The Court finds the instant case to be distinguishable from *Norman*. Here, the ALJ complied with SSR 02-1p by (1) recognizing his obesity as a severe impairment at Step Two; (2) considering the impact of Hanna's obesity on his other severe impairments at Step Three; and, (3) recounting the medical evidence regarding his obesity and considering its effect in determining the RFC at Step Four. Neither SSR 02-1p nor Sixth Circuit authority requires the ALJ to engage in any further analysis of this issue. *See e.g. Hall*, 2013 WL 6175660 at * 2, 9; *Weyand v. Colvin*, 2013 WL 5939779 at * 8-9 (N.D. Ohio Nov. 5, 2013).

Hanna also argues that, when discussing his obesity at Step Four, the ALJ erroneously found that consultative examiner Lokendra Saghal's report showed Hanna had "good range of motion of his knees." (Tr. 454-460.) Hanna also complains that the ALJ "relied heavily" upon the opinion of state agency physician Dr. Congbalay, but "a review of Dr. Congbalay's analysis reveals that it is devoid of any obesity analysis or reference." (Doc. No. 13 at 21.)

The Court rejects these arguments. Dr. Saghal found that, with respect to Hanna's knees, active flexion was 100 degrees and passive flexion was 110 (instead of 150); and extension was 0 degrees (instead of 01). (Tr. 455, 460.) The ALJ apparently interpreted this data as demonstrating "good range of motion." While Hanna argues this is inaccurate, he does not cite any medical or opinion evidence suggesting the ALJ was incorrect in this assessment. Moreover, the ALJ's interpretation of this data is consistent with his earlier observations that (1) the June 2008 MRI of Hanna's knee showed only mild degenerative changes; and, (2) Hanna reported the ability to ride his bike and walk a few blocks "almost every day." (Tr. 18.)

With respect to the ALJ's reliance on Dr. Congbalay's report, Hanna is correct that Dr. Congbalay does not mention Hanna's weight or obesity in determining her assessment of Hanna's functional limitations. (Tr. 461-468.) However, the Court notes that, when he applied for disability, Hanna did not list obesity as one of the medical conditions that limits his ability to

20

work. (Tr. 151.)  Moreover, while Dr. Talampas' treatment notes routinely record Hanna's weight and often encourage him to exercise and lose weight, Hanna does not direct this Court's attention to any evidence in the medical record that he was ever formally diagnosed with obesity. Indeed, even Dr. Talampas' January 2012 opinion does not list obesity as a basis for her assessment of Hanna's physical functional limitations.  That being said, the Court notes that, in evaluating Dr. Congbalaly's opinion, the ALJ expressly acknowledged that "evidence at the hearing level suggests Mr. Hanna is more limited in his ability to stoop, his ability to climb ramps and stairs and in his reaching with his left arm." (Tr. 20.)  The ALJ, therefore, gave "those portions of the State Agency opinions little weight."  *Id*.  Hanna does not argue that the ALJ's evaluation of Dr. Congalabay's opinion was improper.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly evaluated Hanna's obesity pursuant to SSR 02-1p.  Hanna's arguments to the contrary are without merit.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED and judgment entered in favor of the Defendant.

s/ Greg White
United States Magistrate Judge

Date: March 25, 2014

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6ᵗʰ Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**